FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

2012 SEP 26  P 3: 22

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

NAVAJO AIR, LLC, )
trading as NAVAJO FABRICS, )
a Rhode Island limited liability company, )
)
                      Plaintiff, )
v. )       Civil Action No. _3:12CV690_
)
STEPS, INC., )
a Virginia non-stock corporation, )
)
**Serve:** Sharon Harrup, Registered Agent )
        Route 2, Box 292 )
        Farmville, Virginia 23901 )
)
                    Defendant. )

## COMPLAINT

Plaintiff, Navajo Air, LLC, t/a Navajo Fabrics ("Navajo"), by counsel, for its Complaint against STEPS, Inc. (the "Defendant"), states as follows:

### NATURE OF ACTION

1.     This is an action resulting from breaches of contract and fraud on the part of the Defendant. Navajo is a producer and supplier of printed fabrics, and it supplied such materials to the Defendant on open account. Beginning in September 2011, the Defendant, having an open account balance in excess of $100,000, began to fall behind on its payments to Navajo and sought additional time to pay its outstanding invoices. In October 2011, Nancy Connor ("Ms. Connor"), an employee of the Defendant, contacted Navajo stating that the fabric purchased from Navajo was being used by the Defendant to fill a government contract, and that, despite years of acceptable garments, the Defendant had been assigned a new government inspector who incorrectly rejected the garments due to purported defects. Ms. Connor assured Navajo that a

meeting was scheduled in late December 2011 where this defect issue would be resolved. Ms. Connor went on to state that because the garments were not defective, they would be accepted by the government in January 2012, and that the Defendant would use the proceeds to pay-down its open account due to Navajo. Based on these representations, Navajo continued to supply the Defendant with printed fabrics, supplying the Defendant with $312,935.70 worth of goods during from October 2011 to January 2012. Despite the Defendant's assurances, because of its growing account balance, the parties met at the Defendant's facilities in Farmville, Virginia in January 2012 to discuss how the parties would continue their business relationship. During this meeting, Sharon Harrup, the Defendant's President and CEO ("Ms. Harrup"), advised Navajo for the first time that the true reason Navajo was not paid was not because of purportedly defective goods and a delay in government contracts, but rather, because the Defendant was utilizing the payments received from the government for internal capital to diversify its business, creating several startup ventures which required large amounts of capital. Had Navajo known the truth about why it was not being paid, it would not have extended such credit to the Defendant. Ms. Harrup assured Navajo that in future dealings, the Defendant would generate a purchase order to Navajo, who would then send an invoice to the Defendant. In order to avoid further extending excessive credit to the Defendant, Navajo would not deliver an order until Navajo received its payment for such order. It was understood that payments would be applied to the outstanding prior due balance. The Defendant further promised to pay additional funds with each invoice to pay-down the open account. The parties' relationship continued in this fashion over the next six months. Despite making some payments on new orders, the Defendant rarely made additional payments. In late June 2012, the Defendant again made promises to Navajo that payment would be made for forthcoming goods, and that each month the Defendant would pay additional sums

in order to pay-down its account balance. The Defendant further advised Navajo that it expected to receive a new government contract and would be needing large sums of printed fabric. Navajo stated that it was able to fill such orders. The Defendant responded that it would source this fabric from Navajo. Despite these promises, the Defendant again failed to pay Navajo and, instead, cut all ties, has refused to pay its outstanding balance, and entered into an agreement with a different fabrics supplier to fill the new government contract leaving an unpaid balance of $419,385.60.

### THE PARTIES

2.      Navajo is, and at all times relevant hereto has been, a Rhode Island limited liability company with its principal place of business in Westerly, Rhode Island.  Navajo's sole member is Ernest Chornyei, a citizen of Rhode Island.

3.      The Defendant is, and at all times relevant hereto has been, a Virginia non-stock corporation with its principal place of business in Farmville, Virginia.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

5.      Without limitation, this Court may exercise personal jurisdiction over the Defendant pursuant to Va. Code § 328.1(1) and (3).

6.      Venue is proper in the Richmond Division of the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(a) and (c), and Rule 3 of the Local Rules of this Court.

<u>FACTS</u>

7.      Navajo is a Rhode Island limited liability company specializing in the production and supply of printed fabrics.

8.      Beginning in February 2010, the Defendant began contracting with Navajo for the purchase of its printed fabrics on open account pursuant to invoices calling for payments within sixty (60) days of receipt.

9.      The parties' business relationship continued smoothly until September 2011, when the Defendant, with an open account balance in excess of $100,000, began failing to make timely payments.

10.     In September 2011, the Defendant contacted Navajo seeking additional time to pay its outstanding invoices.

11.     During these conversations, Ms. Connor, the Defendant's purchasing agent, advised Navajo that the fabrics being supplied by Navajo to the Defendant were being used to fill a government contract.

12.     Ms. Connor went on to state that the Defendant was assigned a new government inspector who had erroneously rejected the garments made with Navajo's fabrics.

13.     Ms. Connor assured Navajo, however, that a meeting was scheduled in late December 2011 between the Defendant and the government, whereby the issue of purported defects would be resolved.

14.     Ms. Connor further assured Navajo that the government would accept the garments made with Navajo's fabrics in January 2012, and that the Defendant would use those funds to repay Navajo for its mounting open account.

4

15.    From October 2011 to January 2012, the Defendant accrued an additional $312,935.70 to its open account balance with Navajo. Navajo permitted this based on the belief that the issues relating to purported defects with the Defendant's garments would be resolved in January 2012 and that Navajo would be fully paid in January 2012. A statement dated December 31, 2011 and invoice dated January 16, 2012 evidencing the $312,935.70 worth of goods provided during this time period are attached hereto and collectively marked **Exhibit A**.

16.    As Navajo became uneasy with this growing account, in an effort to put their business relationship back on track, and at the insistence of Navajo, the parties met at the Defendant's headquarters in Farmville, Virginia in January 2012.

17.    During this meeting Ms. Harrup, the Defendant's president and CEO, advised Navajo that the true reason it was not being paid had nothing to do with the government inspector or the garments. In reality, Ms. Harrup advised that the Defendant was using the proceeds from the government contract to diversity its business operations with several new "start-ups" including, developing a document-shredding business which had required heavy amounts of capital over the previous months.

18.    Ms. Harrup further indicated that these start-ups were failing and not turning a profit that would enable the Defendant to pay down its balance to Navajo

19.    Had Navajo known that the real reason it was not being paid had nothing to do with the rejection of garments by government inspectors, but rather that Navajo was lied to and had in essence been providing venture capital to the Defendant, it never would have extended such credit.

20.    Moving forward, the parties agreed that Navajo would supply no further credit to the Defendant. Instead, for new orders, the Defendant would generate a purchase order and

provide it to Navajo. Navajo would then issue an invoice to the Defendant and, upon payment of the invoice, Navajo would ship the order.

21.     In addition, the Defendant promised that with each invoice, the Defendant would pay additional monies to Navajo to pay down their large account balance.

22.     In February 2012, the Defendant made two small additional payments which were applied to the oldest invoices. Despite its many assurances that additional would be forthcoming monthly, no other additional funds were received.

23.     In addition to the $312,935.70 accrued from October 2011 to January 2012, the Defendant had a prior outstanding balance of $106,449.90, leaving a total open account of $419,385.60.

24.     In June 2012, the Defendant contacted Navajo, regarding an anticipated government contract that was being negotiated between the Defendant and the government. Navajo assured the Defendant that it would be able to supply all printed fabrics needed to accommodate the Defendant's needs relating to such contract. In turn, the Defendant stated that it would utilize Navajo for its supply needs with regard to this contract.

25.     During these discussions, the Defendant further asserted that the proceeds realized from this new government contract would be utilized to pay down the Defendant's account balance.

26.     Navajo stated it was able to supply such fabrics and welcomed the Defendant's promise to pay down the account balance.

27.     Instead, the Defendant revised the government contract to include a different fabrics supplier and has since cut all communications with Navajo leaving an open account of

6

$419,385.60. True copies of invoices evidencing the $419,385.60 balance are attached hereto and marked **Exhibit B**.

## COUNT I
### BREACH OF CONTRACT

28.     Navajo hereby incorporates by reference all allegations set forth above in paragraphs 1 through 27 as if fully set forth herein.

29.     Navajo and the Defendant entered into an agreement whereby Navajo would supply the Defendant with certain goods – namely printed fabrics – pursuant to invoices stating that payment for the goods supplied was to be made within sixty (60) days.  In return, the Defendant agreed to pay Navajo within 60 days for such goods.

30.     Despite its obligation to pay Navajo for the goods supplied, the Defendant has failed to pay Navajo in full for the goods provided.

31.     To date, in breach of the parties' agreement, the Defendant has failed to pay Navajo for goods supplied to the Defendant in the amount of $419,385.60.

32.     As a direct and proximate result of the Defendant's breach of the parties' agreement, Navajo has suffered damages of at least $419,385.60.

WHEREFORE, Navajo requests that this Court grant i) judgment against the Defendant in the amount of $419,385.60; ii) post-judgment interest at the judgment rate until paid in full; iii) costs incurred herein; and iv) such other and further relief as this Court deems appropriate.

## COUNT II
### UNJUST ENRICHMENT

33.     Navajo hereby incorporates by reference all allegations set forth above in paragraphs 1 through 27 as if fully set forth herein.

34.     Navajo conferred a benefit upon the Defendant by supplying it with $419,385.60 worth of goods.

35.     The Defendant appreciated and knew of this benefit, as it accepted the goods and continued to place orders for new and additional goods with Navajo.

36.     Despite being supplied with valuable goods for which it should have expected to pay Navajo, the Defendant has failed to pay Navajo for the $419,385.60 worth of goods supplied to the Defendant and has therefore been unjustly enriched.

37.     It would be inequitable for the Defendant to retain the benefit of Navajo's goods without reimbursing Navajo for the value received.

WHEREFORE, Navajo requests that this Court grant i) judgment against the Defendant in the amount of $419,385.60; ii) post-judgment interest at the judgment rate until paid in full; iii) costs incurred herein; and iv) such other and further relief as this Court deems appropriate.

### COUNT III
### FRAUD IN THE INDUCEMENT

38.     Navajo hereby incorporates by reference all allegations set forth above in paragraphs 1 through 27 as if fully set forth herein.

39.     In the September 2011, the Defendant made certain material misrepresentations to Navajo, including misrepresentations that the reason that Navajo was not being paid was that fabric supplied by Navajo was being used for a government contract, and that the Defendant was assigned a new government inspector who was incorrectly asserting that the garments created from Navajo's fabrics were defective.  The Defendant further stated that a meeting was scheduled between the Defendant and the government in late December 2011 to correct these errors, that the garments would be accepted by the government in January 2012, and that Navajo's account would be made current from the funds realized.

8

40.     As part of these misrepresentations, the Defendant requested that Navajo continue to supply fabrics to the Defendant in order to continue filling the government contract, the profits of which were to be used to pay down any account balance owed by the Defendant to Navajo.

41.     In reality, the reason Navajo was not being paid was because the Defendant was taking the funds paid over by the government for the garments made with Navajo's fabric and utilizing them for internal capital for several business "start-ups" including a document shredding business which required large amounts of capital.

42.     The Defendant made these material representations in order to induce Navajo to continue to supply the Defendant with goods based on false pretenses, with the present knowledge that the Defendant was actually using these funds for internal start-up projects, and was unable to repay Navajo in January 2012.

43.     In January 2012, after accruing an additional $312,935.70 to its open account, Ms. Harrup, the Defendant's president and CEO, advised Navajo, for the first time, of the real use of the funds paid over by the government – capital infusion into various business start-ups by the Defendant.

44.     In reliance on the Defendant's misrepresentations, Navajo supplied the Defendant with new goods valued at $312,935.70

45.     But for these misrepresentations, Navajo would not have extended credit to the Defendant.

46.     As a result of the Defendant's actions, Navajo has suffered resulting damage in the amount of not less than $312,935.70.

WHEREFORE, Navajo requests that this Court grant i) judgment against the Defendant in the amount of $312,935.70; ii) post-judgment interest at the judgment rate until paid in full;

iii) costs incurred herein; iv) reasonable attorneys' fees incurred herein to be established at trial pursuant to the "complete relief" doctrine of Prospect Dev. Co. v. Bershader, 258 Va. 75 (1999); and v) such other and further relief as this Court deems appropriate.

### COUNT IV
#### ACTUAL FRAUD

47.     Navajo hereby incorporates by reference all allegations set forth above in paragraphs 1 through 27 as if fully set forth herein.

48.     In the September 2011, the Defendant made certain material misrepresentations to Navajo, including misrepresentations that the reason that Navajo was not being paid was that fabric supplied by Navajo was being used for a government contract, and that the Defendant was assigned a new government inspector who was incorrectly asserting that the garments created from Navajo's fabrics were defective. The Defendant further stated that a meeting was scheduled between the Defendant and the government in late December 2011 to correct these errors, that the goods would be accepted by the government in January 2012, and that Navajo's account would be made current from the funds realized.

49.     As part of these misrepresentations, the Defendant requested that Navajo continue to supply fabrics to the Defendant in order to continue filling the government contract, the profits of which were to be used to pay down any account balance owed by the Defendant to Navajo.

50.     In reality, the reason Navajo was not being paid was because the Defendant was taking the funds paid over by the government for the garments made with Navajo's fabric and utilizing them for internal capital for several business "start-ups" including a document shredding business which required large amounts of capital.

51.     The Defendant made these material representations intentionally in order to induce Navajo to continue to supply the Defendant with goods based on false pretenses, with the

10

present knowledge that the Defendant was actually using these funds for internal start-up projects, and was unable to repay Navajo in January 2012.

52.     In January 2012, after accruing an additional $312,935.70 to its open account, Ms. Harrup, the Defendant's president and CEO, advised Navajo, for the first time, of the real use of the funds paid over by the government – capital infusion into various business start-ups by the Defendant.

53.     In reliance on the Defendant's misrepresentations, Navajo supplied the Defendant with new goods valued at $312,935.70.

54.     But for these misrepresentations, Navajo would not have extended credit to the Defendant.

55.     As a result of the Defendant's actions, Navajo has suffered resulting damage in the amount of not less than $312,935.70.

WHEREFORE, Navajo requests that this Court grant i) judgment against the Defendant in the amount of $312,935.70; ii) post-judgment interest at the judgment rate until paid in full; iii) costs incurred herein; iv) reasonable attorneys' fees incurred herein to be established at trial pursuant to the "complete relief" doctrine of Prospect Dev. Co. v. Bershader, 258 Va. 75 (1999); and v) such other and further relief as this Court deems appropriate.

## COUNT V
### CONSTRUCTIVE FRAUD

56.     Navajo hereby incorporates by reference all allegations set forth above in paragraphs 1 through 27 as if fully set forth herein.

57.     In the September 2011, the Defendant made certain material misrepresentations to Navajo, including misrepresentations that the reason that Navajo was not being paid was that fabric supplied by Navajo was being used for a government contract, and that the Defendant was

11

assigned a new government inspector who was incorrectly asserting that the garments created from Navajo's fabrics were defective. The Defendant further stated that a meeting was scheduled between the Defendant and the government in late December 2011 to correct these errors, that the goods would be accepted by the government in January 2012, and that Navajo would be paid based on the funds realized.

58.     As part of these misrepresentations, the Defendant requested that Navajo continue to supply fabrics to the Defendant in order to continue filling the government contract, the profits of which were to be used to pay down any account balance owed by the Defendant to Navajo.

59.     In reality, the reason Navajo was not being paid was because the Defendant was taking the funds paid over by the government for the garments made with Navajo's fabric and utilizing them for internal capital for several business "start-ups" including a document shredding business which required large amounts of capital.

60.     The Defendant made these material representations innocently or negligently at the time such representations were made.

61.     In January 2012, after accruing an additional $312,935.70 to its open account, Ms. Harrup, the Defendant's president and CEO, advised Navajo, for the first time, of the real use of the funds paid over by the government – capital infusion into various business start-ups by the Defendant.

62.     In reliance on the Defendant's misrepresentations, Navajo supplied the Defendant with new goods valued at $312,935.70.

63.     Had Navajo known the real use of these funds, it would not have extended credit to the Defendant.

64.     As a result of the Defendant's actions, Navajo has suffered resulting damage in the amount of not less than $312,935.70.

WHEREFORE, Navajo requests that this Court grant i) judgment against the Defendant in the amount of $312,935.70; ii) post-judgment interest at the judgment rate until paid in full; iii) costs incurred herein; iv) reasonable attorneys' fees incurred herein to be established at trial pursuant to the "complete relief" doctrine of Prospect Dev. Co. v. Bershader, 258 Va. 75 (1999); and v) such other and further relief as this Court deems appropriate.

                                     NAVAJO AIR, LLC,
                                     trading as NAVAJO FABRICS

                                     By: _____
                                                     Counsel

Andrew P. Sherrod (VSB No. 45854)
Franklin R. Cragle, III (VSB No. 78398)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:  804.771.9500
Facsimile:  804.644.0957
E-mail:     asherrod@hf-law.com
E-mail:     fcragle@hf-law.com

*Counsel for Navajo Air, LLC, t/a Navajo Fabrics*

4585709-2 038423.00001

13